IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

JOSHUA DAVIS,

             Defendant.

CRIMINAL CASE NO.

1:16-CR-00074-WSD-JFK

## <u>REPORT AND RECOMMENDATION</u>

Pending before the court is Defendant Joshua Davis' motion [Doc. 16] to suppress statements he gave on December 9, 2015, and on January 21, 2016, to Special Agents ("SA") of the Federal Bureau of Investigation ("FBI"). An evidentiary hearing was held on the motion on June 15, 2016.[1] [Doc. 21]. Defendant contends that, based on the totality of the circumstances, he was in custody when he gave the statements and that, therefore, he should have been but was not advised of his <u>Miranda</u> rights at the initiation of each interview. With respect to the second statement, although advised of his <u>Miranda</u> rights during the course of his encounter with the agents, Defendant asserts that statements made before rights were waived should be suppressed. [Doc. 22 at 5-13]. The Government opposes the motion to suppress the statements asserting

---

[1]Citations to the transcript of the hearing are:  (Tr. at ).

that Defendant was not in custody during the times he was being interviewed.  [Doc.

23].  After consideration of the totality of the circumstances, the court recommends

that Defendant's motion be denied.

## I.    Facts

On October 15, 2015, approximately $170,000 in funds were discovered missing

from at least seven ATMs located in Warner Robins, Georgia, belonging to the Robins

Federal Credit Union ("RFCU").  (Tr. at 10, Gov't Exh. 1).[2]  Defendant Davis, an

employee at the time with Brinks, along with a second employee, Naheem Carrington,

serviced the route which included the ATMs in question on October 15, 2015.

Defendant, the driver, personally serviced all the ATMs on the route that day due to

Carrington's, the messenger, lack of experience.[3]  The agents suspected that Defendant

purloined funds intended to be used to restock the seven ATMs.  (Tr. at 4-5, 32-33,

Gov't Exh. 1).

_____

[2]Government exhibit 1 is an audio recording of the interview with Defendant Davis on December 9, 2015, and information about the events underlying the 18 U.S.C. § 2113(b) charge in the indictment [Doc. 1], not provided at the evidentiary hearing, are gleamed from that interview.

[3]As the court understands from the interview, typically route drivers remain in the Brink's truck while the messenger services the machines and other RFCU locations.  Servicing includes removing funds or other deposit items out of each location and restocking currency as necessary.  (Gov't Exh. 1).

2

FBI SA Dayne Henriques requested that Brinks Regional Security Manager Michael Anfeldt bring Defendant Davis and Carrington to the FBI office for an interview concerning the missing RFCU ATM funds. (Tr. at 4-5, 34). On December 9, 2015, Defendant Davis testified that, when he arrived at work at 7:08 a.m., his supervisor advised him to go with Anfeldt. Defendant was not sure where he was going. (Tr. at 50-51). Although Defendant concedes that he was not told that he would be fired if he did not accompany Anfeldt, he testified that he felt he had no choice and stated, "I believe I would have gotten written up or fired for insubordination" if he did not go. (Tr. at 51-52, 54). Anfeldt drove Defendant and Carrington in a rental vehicle to the FBI office. (Tr. at 5, 35, 51).

At the FBI office, Agents Henriques and Dave Fitzgibbons greeted the three men outside of the first floor lobby, and Defendant, Anfeldt and Carrington entered through security and then were escorted to rooms for their interviews. (Tr. at 5). Agent Henriques testified that all visitors who are not FBI personnel are escorted within FBI office space as part of normal protocol.[4] (Tr. at 5-6, 38-39). Defendant

---

[4]The agent further explained that in order to enter into the FBI space on each floor, secured doors must be accessed; however, the doors are not locked from the inside and the space may be freely exited. (Tr. at 39-40, 46). Additionally, a person exiting the FBI building is not required to go back through security but may simply leave the building. (Tr. at 46).

was escorted to the fourth floor law library for the interview. (Tr. at 8). The agents were attired in business casual clothing with their weapons concealed underneath their clothing. (Tr. at 6-7). Throughout the time with Defendant, approximately one hour, the agents did not draw their weapons, did not handcuff or otherwise physically restrain Defendant and did not use physical force on Defendant, and the tone of the conversation was calm. (Tr. at 7-8, 12-13, 54).

The law library is approximately a 20 foot by 10 foot room with two doors, which were unlocked but closed, and in which Defendant could freely move around, but, per policy, he would be escorted outside the room. The two agents and Defendant sat at the conference table located in the room. (Tr. at 8-10, 41-42). The recorded interview began with the agents identifying themselves and explaining that the interview concerned the Brinks' deposits of RFCU funds on the Warner Robins route. (Tr. at 10-11, Gov't Exh. 1). Agent Henriques then advised Defendant that he was not under arrest and that "at the end of the day" Defendant was leaving. Defendant was advised that he was free to go.[5]  (Tr. at 10, 14, 36-37). The interview lasted

---

[5]The agent testified that he did not literally mean the "end of the day" but that the phrase is used by him to mean "basically" and was used by the agent in several different contexts during the interview. (Tr. at 11-12, 36-37). For example, immediately after advising Defendant that "at the end of the day" he would be leaving, the agent stated that "at the end of the day" his job was to figure out what happened

approximately one hour and eleven minutes.  (Tr. at 14, Gov't Exh. 1).  The agents did not threaten Defendant, did not make him any promises and did not even suggest that he would lose his job if he did not cooperate.  (Tr. at 12, 45, 54).  Defendant did not appear to be under the influence of drugs or alcohol and appeared to comprehend the questions that he was asked.  (Tr. at 12-13).  Defendant was not advised that he had a right to an attorney or any other <u>Miranda</u> rights, and he did not ask to stop the interview, for an attorney or to leave.  (Tr. at 14, 42).  During the interview, the agents asked for his girlfriend's telephone number which Defendant agreed to provide; however, he did not have his cellular telephone with him in order to provide the number.[6]  He agreed that the agents could follow him back to Brinks so that he could

_____

the missing RFCU funds.  Defendant was repeatedly advised that, no matter what he said during the interview, additional investigation needed to be conducted and that he was leaving and was not going to be arrested.  (Tr. at 14, Gov't Exh. 1).

[6]Based on the information discussed during the interview, on the return trip from Warner Robins on October 15, 2015, the Brinks' truck ran out of gas and a tow had to be requested to get the truck back to Brinks.  Defendant stated that because he was hungry, due to the late time of day, and because he did not expect the tow truck to arrive for several hours, he called his girlfriend to come to the location of the Brinks truck and pick him up to go get some food, leaving Carrington in the truck.  Witnesses reported to police observing the parked Brinks truck and the driver of the truck, Defendant, exiting with a bag and entering a vehicle, apparently operated by Defendant's girlfriend, then driving away.  The agents suspected that Defendant removed the missing funds during this time.  (Gov't Exh. 1).

5

retrieve his girlfriend's telephone number.  (Tr. at 15; Gov't Exh. 1).  The Defendant maintained his innocence throughout the interview and declined a polygraph examination.  (Tr. at 37-38; Gov't Exh. 1).  When the interview was over, Defendant was escorted out of the FBI office space, and the agents followed the vehicle in which Defendant was riding back to Brinks.  (Tr. at 14-15).  Defendant was back at the Brinks' offices by 10:12 a.m.  (Tr. at 50).

After the agents conducted further investigation, including speaking to Defendant's girlfriend about the missing RFCU funds and being advised by her that Defendant had taken the money, Agent Henriques with Special Agent Robert McAlister traveled to Defendant's apartment on January 21, 2016, arriving at approximately 9:55 a.m.  (Tr. at 16-17, 43).  The agents were dressed in business casual attire, and their firearms were concealed.  (Tr. at 16-17, 43).  The agents knocked on the door but received no response.  As they were about to leave, Defendant arrived in his vehicle and exited.  (Tr. at 17, 43).  Agent Henriques, after identifying himself, asked if Defendant remembered him, and Defendant indicated that he did not. The agent asked if they could speak with him inside the apartment.  Defendant agreed and invited the agents inside.  (Tr. at 17, 43).  Agent Henriques sat on the couch, and Agent McAlister stood near the door with Defendant standing between them.  (Tr. at

6

17-18, 43).   The agents again identified themselves and explained that they had conducted additional investigation and that Defendant's girlfriend had advised that Defendant had taken the money.  Defendant responded, "[O]h, yeah, now I know why you're here."  (Tr. at 17).

Agent Henriques testified that he then advised Defendant of his <u>Miranda</u> rights.[7] (Tr. at 18; Gov't Exh. 2).  At approximately 10:03 a.m., the agent asked Defendant to read the form aloud to him and to initial each sentence.  Defendant then signed the form, and at approximately 10:05 a.m., the agents signed the form.  (Tr. at 19-20, Gov't Exh. 2).  The form states:

> Before we ask you any questions, you must understand your rights.
>
> You have the right to remain silent.
> Anything you say can be used against you in court.
> You have the right to talk to a lawyer for advice before we ask you any questions.
> You have the right to have a lawyer with you during questioning.

---

[7]Defendant testified that on January 21, 2016, he spoke to the agents in the apartment but that he was not advised of his rights until just before the agents and he entered the vehicle to go to the location where some of the money could be located. (Tr. at 53-54).  He stated that he did not "believe" that he signed the form in the apartment.  (Tr. at 54).  Defendant provides no more specifics about any conversation in the apartment before allegedly being advised of his rights. (Tr. at 52-54).  As noted, Defendant only seeks to suppress any statements that he made before being advised of and waiving his rights.  [Doc. 22 at 12-13].

7

If you cannot afford a lawyer, one will be appointed for you before any
questioning if you wish.
If you decide to answer questions now without a lawyer present, you have
the right to stop answering at any time.

The form then provides, "I have read this statement of my rights and I understand what

my rights are.  At this time, I am willing to answer questions without a lawyer

present."  (Tr. at 20; Gov't Exh. 2).  The agent advised that Defendant was not

interviewed in the apartment.  They left immediately for Defendant to show the agents

where he discarded some of the RFCU funds.  (Tr. at 21, 43-44).

Defendant walked with the agents to their vehicle; he was not restrained or

touched.  He entered and sat in the front passenger seat; the door next to him was not

locked from the outside and could be opened.  (Tr. at 21).  Agent Henriques drove with

Agent McAlister seated in the back.  Defendant provided the directions.  (Tr. at 21-22).

While driving, Agent McAlister advised Defendant that he was not in custody and was

not under arrest.  (Tr. at 26).   When they arrived at the location identified by

Defendant, all three men exited the vehicle and reentered when nothing was apparently

found.  (Tr. at 23-24).  Agent Henriques testified that Defendant could have left any

time and that he was not restrained.  The agents did not brandish their weapons.  (Tr.

at 23-25).

8

Once they were back in the vehicle, Agent Henriques began an audio recording and advised Defendant that he was not under arrest and that nothing was going to happen now because the agents still needed to gather information.  (Tr. at 25-26; Gov't Exh. 3).  Defendant then explained what happened to the RFCU funds.  They drove back to the apartment.  (Tr. at 26-27).  At the apartment, Defendant signed a consent to search form and the agents recovered $3,200 in missing funds.  (Tr. at 27, 44).[8]  The agents left.  Defendant was not arrested; he was not handcuffed.  (Tr. at 27-28).

During January 21, 2016, the agents did not make Defendant any promises, did not threaten him and did not touch or physically restrain Defendant.  (Tr. at 28).  The tone of the conversation was calm.  Defendant appeared to understand the questions and did not appear to be under the influence of drugs or alcohol.  (Tr. at 28-30).  He did not ask to stop the interview or for an attorney.  (Tr. at 30).  That agents spent approximately one hour and thirty minutes with Defendant of which the recorded interview lasted twenty-four minutes.  (Tr. at 30, Gov't Exh. 3).

On February 16, 2016, Defendant was indicted by a federal grand jury for violation of 18 U.S.C. § 2113(b).  [Doc. 1].  The grand jury alleged that on or about October 15, 2016, Defendant "did take and carry away with the intent to steal and

---

[8]Defendant is not challenging the consent to search.  (Tr. at 46-47).

9

purloin approximately $170,160.00 of money belonging to Robins Federal Credit Union . . . ."  [Id.].

Additional facts will be set forth as necessary during discussion of Defendant's motion to suppress statements.

## II.   Discussion

Defendant contends that the totality of the circumstances establish that he was in custody on December 9, 2015, and January 21, 2016, when he gave the statements to FBI agents and, therefore, that the failure to advise him of his Miranda rights prior to the interviews violated his Fifth Amendment right against self-incrimination.  [Doc. 22 at 5-13].  The Government contends that Defendant was not in custody when he gave his statements.  [Doc. 23].

In Miranda v. Arizona, 86 S. Ct. 1602 (1966), the Supreme Court held that "a person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'"  Stansbury v. California, 114 S. Ct. 1526, 1528 (1994) (quoting Miranda, 86 S. Ct. at 1612).  The Supreme Court subsequently clarified "that

10

the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody." Maryland v. Shatzer, 130 S. Ct. 1213, 1224 (2010).  The Court stated, "We have declined to accord it 'talismanic power,' because Miranda is to be enforced 'only in those types of situations in which the concerns that powered the decision are implicated.'"[9] Id. (quoting Berkemer v. McCarty, 104 S. Ct. 3138, 3148-49 (1984)).  Accordingly, "[a]n officer's obligation to administer Miranda warnings attaches . . . only where there has been such a restriction on a person's freedom as to render him in custody." Stansbury, 114 S. Ct. at 1528 (quoting Oregon v. Mathiason,

---

[9]Applying this test to an investigative detention, the Eleventh Circuit Court of Appeals explained:

> [A]lthough a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment – and thus may be deemed to have been "seized" by law enforcement – he will not necessarily be considered in "custody" for Fifth Amendment purposes. . . .
>
> Rather, "a free-to-leave inquiry reveals *only* whether the person questioned was seized.". . .  While "seizure is a necessary prerequisite to Miranda, . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed *to a degree associated with formal arrest*."

United States v. Luna-Encinas, 603 F.3d 876, 881 (11th Cir. 2010) (citations omitted; emphasis in original).

11

97 S. Ct. 711, 714 (1977) (per curiam)) (internal quotation marks omitted);

accord United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006).

This determination "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury, 114 S. Ct. at 1529; and see United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006) (same). While "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned[,]" Stansbury, 114 S. Ct. at 1529-30, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was in custody at a particular time . . .," United States v. Lall, 607 F.3d 1277, 1284 (11th Cir. 2010) (citation and internal quotation marks omitted). "'[U]nder the objective standard, the reasonable person from whose perspective custody is defined is a reasonable innocent person.'" Street, 472 F.3d at 1309 (citation omitted); see also Brown, 441 F.3d at 1347 (same); United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996) ("Whether a defendant knows he is guilty and believes incriminating evidence will soon be discovered is irrelevant."). The objective factors to be considered include "'whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled, as well as the location

12

and length of the detention.'" United States v. Riquene, 552 Fed. Appx. 940, 942 (11th Cir. 2014) (quoting Luna-Encinas, 603 F.3d at 881 & n.1).

>    **a.      December 9, 2015**

Defendant contends that Miranda warnings were required before he was interrogated on December 9, 2015, because he was in custody.  In support of that contention, he identifies three factors: that he did not go to the FBI offices voluntarily, that Special Agent Henriques advised Defendant that he would be free to go "at the end of the day," and that the interview was conducted at the secured FBI offices.  [Doc. 22 at 5-12].  However, the court finds that the totality of the circumstances, considered objectively, would not have led a innocent person to reasonably believe that he was in custody on December 9, 2015.

First, Defendant's reliance on the location of the interview is not dispositive. In California v. Beheler, 103 S. Ct. 3517 (1983), the Supreme Court, in rejecting the appellate court's focus on the fact that the defendant, a suspect against whom the police had a great deal of information, had been interviewed at the police station, stated, "[W]e have explicitly recognized that Miranda warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" Id. at 3520 (quoting Mathiason,

97 S. Ct. at 714 ("a noncustodial situation is not converted to one in which <u>Miranda</u> applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment'" such as a police station or because the person is one suspected of committing a crime)).[10]

The fact that the FBI offices where the interview was conducted was a "secure" space does not alter this conclusion.  Arguably, all law enforcement offices or police stations are "secure" spaces placing some restrictions on freedom of movement.  However, in this case, Defendant was not singled out for more restrictions than the FBI's protocol placed on all non-FBI personnel in the building.  When Defendant arrived, along with Anfeldt and Carrington, he was greeted by Agents Henriques and Fitzgibbons outside the lobby, and the three visitors entered through security and then were escorted to rooms for their interviews.  (Tr. at 5).  Agent Henriques testified that

_____

[10]Although not raised by Defendant as a factor supporting a finding of custody, the fact that the agents suspected Defendant of stealing the funds from the ATMs does not render the questioning custodial. <u>See</u> <u>Stansbury</u>, 114 S. Ct. at 1530 ("Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest."); <u>United States v. Manor</u>, 936 F.2d 1238, 1241 (11th Cir. 1991) ("The Supreme Court has clearly stated that <u>Miranda</u> is not implicated simply because an individual is the subject or target of an investigation.") (citing <u>Minnesota v. Murphy</u>, 104 S. Ct. 1136, 1144 (1984)).

14

all visitors who are not FBI personnel are escorted within FBI office space as part of normal protocol. (Tr. at 5-6, 38-39). The agent further explained, that in order to enter into the FBI space on each floor, secured doors must be accessed; however, the doors are not locked from the inside and the space may be freely exited. (Tr. at 39-40, 46). Additionally, a person exiting the FBI space is not required to go back through security but may simply leave the building. (Tr. at 46). Accordingly Defendant was escorted to the fourth floor law library for the interview. (Tr. at 8).

In United States v. Muegge, 225 F.3d 1267 (11th Cir. 2000), the Eleventh Circuit Court of Appeals addressed similar circumstances and found that the fact the interview was conducted in a secure facility did "not necessarily make the interrogation custodial." Id. at 1271. As in this case, the evidence in Muegge established that all visitors to the facility were escorted while in the building and that, although the facility was locked, no key was needed to leave the building - additionally, as in this case (Tr. at 13-15), when the interview was concluded, the defendant left the building and was not arrested until a number of months later. Id.; and see United States v. Ambrose, 668 F.3d 943, 956-57 (7th Cir. 2012) (the defendant was interviewed at the FBI offices, appearing "essentially" on orders to do so, where he was required to relinquish various items, such as, weapons, cell phones, keys, at the security entrance and where he was

AO 72A
(Rev.8/82)

escorted while in the building; however, the court held that these facts were "not indicative of custody to a reasonable person because the security restrictions were uniformly applied");[11] <u>United States v. Paige</u>, 241 Fed. Appx. 620, 622 n.1, 623 (11th Cir. 2007) (the defendant, who traveled to the police department with the police detective, was advised that he was not under arrest and was free to leave, was not in custody during an interview that took place in an unlocked room at the department with three law enforcement officers present, after which the detective drove the defendant to his girlfriend's home); <u>United States v. Bazile</u>, 2013 WL 3776271, at *11 (S.D. Fla. July 17, 2013) (the court found that the defendant, who was interviewed on two occasions at the FBI offices and was driven to the interviews by law enforcement officers, was not in custody, noting that the defendant was escorted while in the building but was not otherwise restrained or handcuffed, was advised that his statement was voluntary and went home after the interview).

---

[11]Additionally, as in this case (Tr. at 8-9, 12-14, 39-42), the court noted, although the interview did not take place in public, that the agents, who were attired in business dress not uniforms, used a spacious conference room located in office space occupied by FBI employees and was not isolated and that nothing physically prevented the defendant's exit from the room.  Further, the defendant, as is true in this case (Tr. at 10-11, 36-37; Gov't Exh. 1), was advised that he was not under arrest.  <u>Id.</u> at 957-58.  All of the factors considered by the appellate court supported a finding that the defendant was not in "custody" requiring <u>Miranda</u> warnings.  <u>Id.</u> at 958.

AO 72A
(Rev.8/82)

In this case, although at the FBI offices, the two FBI agents, who were not in uniform, who were armed but whose weapons were concealed and never displayed, who never handcuffed or physically restrained Defendant and who told Defendant that the interview was voluntary and that he was not under arrest but was free to go (Tr. at 6-8, 10-13), simply did not subject Defendant to "such a restriction on his freedom as to render him in custody." Stansbury, 114 S. Ct. at 1528 (citation and internal quotation marks omitted). The other circumstances pointed out by Defendant do not alter the court's determination.

Defendant points to the fact that he was told to go with Anfeldt by his supervisor and that he was fearful of reprimand or termination if he did not comply. (Tr. at 34-35, 51-52). Defendant conceded that he was not told by Brinks, his employer, that he would suffer adverse consequences for not accompanying Anfeldt. The interviewing agents made no such threats, as Defendant likewise concedes. (Tr. at 12, 34, 45, 54). The agents, in fact, told Defendant that the interview was voluntary. (Tr. at 10-11; Gov't Exh. 1). The Eleventh Circuit's decision in Muegge is dispositive of this argument. In Muegge, the court found that the defendant's supervisor instructed him to report for the interview with investigators; however, the court concluded that "such an order, absent other coercive elements, did not constitute the type of restraint on [the

17

defendant's] freedom associated with a formal arrest." <u>Id.</u> at 1270.  As in this case, in

<u>Muegge</u>, the order to attend the interview "was [not] accompanied by any explicit or

implicit threat to [the defendant's] employment status."  <u>Id.</u> at 1271; <u>and see</u> <u>United</u>

<u>States v. Dudley</u>, 2011 WL 1100607, at *5 (N.D. Ga. February 3, 2011) (noting that

the defendant cited "nothing coercive about the circumstances" of the interview

"except for the fact that he feared he would lose his job if he did not cooperate with the

. . . investigators[,]" because he had been ordered to speak with the investigators by his

supervisors, the court found that this fact was "insufficient to create a custodial

interrogation requiring that <u>Miranda</u> warnings be given").[12]  And, while Defendant may

---

[12]The <u>Dudley</u> court cites, *inter alia*, a decision by the Eighth Circuit Court of Appeals, <u>United States v. Dockery</u>, 736 F.2d 1232 (8th Cir. 1984) (en banc), which held "that defendant was not in custody under similar circumstances where she 'was directed by *her employer* to meet with the agents" noting that '[o]rdinarily, when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials [sic], but by the workers' voluntary obligations to their employers.'" 2011 WL 1100607, at *5 (quoting <u>Dockery</u>, 736 F.2d at 1234) (emphasis added).  Defendant relies on another decision of the Eighth Circuit in support of his argument; however, that decision, <u>United States v. Ollie</u>, 442 F.3d 1135 (8th Cir. 2006), is distinguishable from the facts in <u>Dockery</u> and from the facts before this court.  As in <u>Dockery</u>, Defendant Davis' *employer* directed him to go to the interview without threat of adverse consequences.  Whereas in <u>Ollie</u>, the defendant, who was on parole, was ordered by his parol officer at the request of law enforcement to meet with and talk to the police.  442 F.3d at 1136.  The court found significant that the defendant's "parole officer testified that it would have been a violation of his parole for [the defendant] to refuse to go to the meeting and that a refusal could have led to [the defendant's] parole being revoked . . . .  [The Defendant] had little choice

have felt compelled to go to the FBI offices, once he arrived there, the agents advised him that the interview was voluntary and that he was not under arrest and was free to leave (Tr. at 10-12, 14, 36-37; Gov't Exh. 1) further dispelling any objectively reasonable concerns that Defendant may have had about submitting to the interview.

Finally, Agent Henriques' statement that "at the end of the day" Defendant would be leaving does not support a finding that the interview was custodial.[13] Whatever the agent meant by the use of the phrase, and it is objectively evident to anyone listening to the interview and should have been to Defendant at the time of the interview that the agent uses the phrase in a number of different contexts (Gov't Exh. 1), Defendant was advised that the interview was voluntary, that he was not under

_____

but to comply."   Id. at 1138, 1140 ("Above all else, we think that it is the parole officer's order that [the defendant] meet with [the police] that quite clearly tips the balance" to finding the defendant was in custody.).   Under the facts before the undersigned, Defendant Davis simply did not reasonably fear loss of his job much less of his freedom by refusing to follow his supervisor's directions.

[13]Even if court finds that Defendant was advised that he would be at the FBI office for the day, mere restraint on freedom of movement does not result in a finding that an interrogation is custodial.  See Luna-Encinas, 603 F.3d at 881 ("While 'seizure is a necessary prerequisite to Miranda, . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed *to a degree associated with formal arrest*.'") (citation omitted; emphasis in original). Based on the totality of the circumstances surrounding the interview, Defendant would not have reasonably concluded that he was in custody.

arrest and that he was going home and was not going to be arrested that day.  (Tr. at 10-11, 14-15; Gov't Exh. 1).  Defendant was not handcuffed nor otherwise physically restrained.  (Tr. at 12).  He was not threatened nor subjected to yelling.  (Tr. at 12-13).  In fact, Defendant did not leave "at the end of the day" but after little over an hour at the FBI office.  (Tr. at 14-15, 50).  The fact that Defendant was repeatedly, and unambiguously, told that he was not under arrest and that cooperation is voluntary "is a powerful factor in the mix [for determining the issue of custody], and generally will lead to the conclusion that the defendant is *not* in custody absent a finding of restraints that are 'so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.'"  Brown, 441 F.3d at 1347 (citation omitted; emphasis in original).  As set forth *supra*, there is no evidence of such restraints in this case.

Accordingly, the court finds that Defendant was not in custody on December 9, 2015, and that the agents were not required to advise Defendant of Miranda warnings before conducting the interview.  The court recommends that Defendant's statement be deemed admissible.

AO 72A
(Rev.8/82)

**b.      January 21, 2016**

Defendant seeks to suppress the statements that he made to FBI agents on January 21, 2016, while in his apartment and before he was advised of his <u>Miranda</u> rights because he claims he was in custody.[14] [Doc. 22 at 12-13]. Defendant, however, presents no facts that would support a finding that he was in custody at any time on January 21, 2016, much less while speaking with the two FBI agents in his apartment. [<u>Id.</u>].

On January 21, 2016, at approximately 9:55 a.m., Agents Henriques and McAlister arrived at Defendant's apartment.  (Tr. at 16-17, 43).  The agents were dressed in business casual attire, and their firearms were concealed.  (Tr. at 16-17, 43). The agents knocked on the door but received no response; however, as they were about

---

[14]As noted by the Government, Defendant does not seek to suppress statements that he made to law enforcement, which were recorded (Gov't Exh. 3), after he concedes being advised of <u>Miranda</u> rights and apparently, as he raises no challenge thereto, after he knowingly, intelligently and voluntarily waived his <u>Miranda</u> rights. [Doc. 23 at 13 & n.2].  The court will not address the events occurring after Defendant testified that he received <u>Miranda</u> warnings and waived those warnings, that is, as discussed *infra*, as the agents and Defendant were leaving his apartment in order to try to locate the missing RFCU funds.  (Tr. at 52-54).  The court notes that Agent Henriques, however, credibly testified that Defendant was advised of and waived his <u>Miranda</u> rights immediately after the agents entered Defendant's apartment and identified themselves and the subject matter of their visit and before any conversation with Defendant occurred.  (Tr. at 17-20; Gov't Exh. 2).

21

to leave, Defendant arrived in his vehicle and exited. (Tr. at 17, 43). Agent Henriques, after identifying himself, asked if Defendant remembered him, and Defendant indicated that he did not.  The agent asked if they could speak with him inside the apartment.  Defendant agreed and invited the agents inside.  (Tr. at 17, 43).  Agent Henriques sat on the couch, and Agent McAlister stood near the door with Defendant standing between them.   (Tr. at 17-18, 43).  The agents again identified themselves and explained that they had conducted additional investigation and that Defendant's girlfriend had advised that Defendant had taken the money.  Defendant responded, "[O]h, yeah, now I know why you're here."[15]  (Tr. at 17).

During January 21, 2016, the agents did not make Defendant any promises, did not threaten him and did not touch or physically restrain Defendant.  (Tr. at 28).  The tone of the conversation was calm.  Defendant appeared to understand what was said

---

[15]At this point, Agent Henriques testified that Defendant was advised of his <u>Miranda</u> rights and waived those rights. (Tr. at 17-20, 43; Gov't Exh. 2).  Defendant testified that the rights were not given until he and the agents exited the apartment in order to try to find the missing funds.  (Tr. at 52-54).  However, only a few minutes could have elapsed between the time when the agent and Defendant each state that <u>Miranda</u> rights were given and waived.  There is no dispute that the agents arrived at Defendant's apartment at approximately 9:55 a.m.  (Tr. at 43).  The <u>Miranda</u> rights form indicates that the form was prepared at 10:03 a.m. and signed at 10:05 a.m.  (Tr. at 18-20; Gov't Exh. 2).   Obviously, as Agent Henriques testified, no lengthy questioning or interview took place before Defendant was advised of and waived his rights.  (Tr. at 21-22, 43-44).

AO 72A
(Rev.8/82)

to him and did not appear to be under the influence of drugs or alcohol.  (Tr. at 28-30).

He did not ask to stop speaking to the agents or for an attorney at any time.  (Tr. at 30).

While driving to the location where the funds were allegedly discarded, Agent

McAlister also advised Defendant that he was not in custody and was not under arrest.

(Tr. at 26).  Before receiving Miranda rights, Defendant was with the agents less than

ten minutes, and, in total, the agents were with Defendant for approximately one hour

and thirty minutes.  (Tr. at 30, Gov't Exh. 3).  After returning to Defendant's apartment

and securing the $3,200, the agents left.  Defendant was not arrested; he was not

handcuffed.  (Tr. at 27-28).

      Besides all of the circumstances indicating that Defendant was not in custody,

including, that he was not handcuffed or physically restrained, that the agents asked

for and received permission to enter Defendant's apartment and to speak with him and

that the agents never drew their concealed weapons, the initial discussion with

Defendant took place in his home.  "Although the location of the interview is surely

not dispositive in determining whether the interviewee was in custody, [c]ourts are

*much less likely* to find the circumstances custodial when the interrogation occurs in

the suspect's home."  Brown, 441 F.3d at 1348 (citations and internal quotation marks

omitted; emphasis in original); and see United States v. Matcovich, 522 Fed. Appx.

850, 851 (11ᵗʰ Cir. 2013) (same).  And Defendant was advised while traveling with the agents to look for the missing funds that "he wasn't in custody, he wasn't under arrest."  (Tr. at 26).  This is an important factor in finding that Defendant was not in custody.  See Matcovich, 522 Fed. Appx. at 851; Brown, 441 F.3d at 1347-48.  Finally, as noted previously, the fact that Defendant was the focus of the agents' investigation into the missing RFCU funds and that they advised him of the information obtained during their investigation implicating him in the crime does not result in a finding that he was in custody.  Stansbury, 114 S. Ct. at 1530; Manor, 936 F.2d at 1241.

Defendant simply was not in custody for the few minutes in his apartment speaking to the agents.  The court recommends that Defendant's statements, both before and after being advised of and waving his Miranda rights on January 21, 2016, be found admissible at trial.

## III.   Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 16] to suppress his statements be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

24

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO ORDERED AND RECOMMENDED**, this 29th day of August, 2016.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

25