**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**UNITED STATES OF AMERICA,**

**v.**                                                                                  1:16-cr-74-WSD

**JOSHUA DAVIS,**

              **Defendant.**

**OPINION AND ORDER**

This matter is before the Court on Defendant Joshua Davis's ("Davis" or "Defendant") Motion to Suppress Statements [16] (the "Motion"). Davis seeks to suppress statements he gave to investigating Federal Bureau of Investigation ("FBI") agents on December 9, 2015, and on January 21, 2016, on the grounds that he was in custody when he gave the statements but was not advised of his Miranda rights at the initiation of each interview.

On June 15, 2016, Magistrate Judge Janet F. King conducted an evidentiary hearing on the Motion. ([21]). On August 29, 2016, The Magistrate Judge issued her Report and Recommendation [24] ("R&R"), which recommends that the Motion be denied. The parties have not objected to the R&R.

**I.     BACKGROUND**

On October 15, 2015, approximately $170,000 in funds were discovered missing from at least seven ATMs belonging to the Robins Federal Credit Union ("RFCU"). (Tr. at 10, Gov't Ex. 1). Brinks employees Davis and Naheem Carrington serviced the route that had the ATMs that were missing money on October 15, 2015. Davis, the driver, personally serviced all the ATMs on the route that day. The agents who questioned Davis suspected that he took funds intended to be used to restock the seven ATMs. (Tr. at 4-5, 32-33, Gov't Ex. 1).

FBI Special Agent Dayne Henriques asked Brinks Regional Security Manager Michael Anfeldt if he could bring Davis and Carrington to the FBI office to be interviewed about the missing ATM funds. (Tr. at 4-5, 34). Davis testified that, on December 9, 2015, when he arrived at work, his supervisor advised him to accompany Anfeldt somewhere, but Davis was not sure where they were going. (Tr. at 50-51). Davis was not told that he would be fired if he did not accompany Anfeldt, but thought he "would have gotten written up or fired for insubordination" if he did not go. (Tr. at 51-52, 54). Anfeldt drove Davis and Carrington to the FBI office. (Tr. at 5, 35, 51).

Special Agents Henriques and Dave Fitzgibbons greeted the three men outside of the lobby of the FBI office. They entered through security and then

2

were escorted to rooms for their interviews. (Tr. at 5). It is normal FBI protocol for visitors, who are not FBI personnel, to be escorted within the FBI's office space. (Tr. at 5-6, 38-39).

Davis was escorted to the law library for his interview. (Tr. at 8). Agents Henriques and Fitzgibbons were dressed in business casual clothes and their weapons were concealed. (Tr. at 6-7). The agents did not draw their weapons and did not handcuff or otherwise physically restrain Davis during the interview. The doors to the law library were closed but not locked. They all sat at a conference table. (Tr. at 8-10, 41-42). The tone of the questioning was calm. (Tr. at 7-8, 12-13, 54).

The agents identified themselves and explained the interview concerned the Brinks' deposits of RFCU funds on the Warner Robins ATM route. (Tr. at 10-11, Gov't Ex. 1). Agent Henriques told Davis that he was not under arrest and that "at the end of the day" Davis would leave. (Tr. at 10, 14, 36-37).[1] Davis was told he was free to go. (Id.).

The interview lasted approximately an hour. (Tr. at 14, Gov't Ex. 1). During it, Davis was not threatened, no promises were made to him, and it was not

---

[1] The agent testified that he did not literally mean the "end of the day" but that the phrase is used by him to mean "basically" and was used by the agent in several different contexts during the interview. (Tr. at 11-12, 36-37). Davis was repeatedly assured he was not going to be arrested. (Tr. at 14, Gov't Ex. 1).

even suggested that he would lose his job if he did not cooperate. (Tr. at 12, 45, 54). Davis did not appear to be under the influence of drugs or alcohol and appeared to comprehend the questions asked. (Tr. at 12-13). He did not ask to stop the interview and did not ask to leave. (Tr. at 14, 42). During the interview, he agreed to give his girlfriend's telephone number to the agents.[2] He agreed to allow the agents to follow him back to Brinks so that he could retrieve his girlfriend's telephone number. (Tr. at 15, Gov't Ex. 1). Davis maintained his innocence during the interview, and declined a polygraph examination. (Tr. at 37-38, Gov't Ex. 1). When the interview was over, Davis was escorted out of the FBI office space, and the agents followed him back to Brinks. (Tr. at 14-15).

The agents conducted their further investigation, including speaking to Davis's girlfriend about the missing RFCU funds. She advised them that Davis had taken the money. Agent Henriques, with Special Agent Robert McAlister, went to Davis's apartment on January 21, 2016, arriving there about 9:55 a.m. (Tr.

---

[2]   Based on the information discussed during the interview, on the return trip from Warner Robins on October 15, 2015, the Brinks truck ran out of gas and had to be towed back to Brinks. Davis stated that because he was hungry, due to the late time of day, and because he did not expect the tow truck to arrive for several hours, he called his girlfriend to come pick him up to get some food, leaving Carrington in the truck. Witnesses reported seeing the parked Brinks truck and the driver of the truck, Davis, exiting with a bag and entering a vehicle, apparently operated by Davis's girlfriend, then driving away. The agents suspected that Davis removed the missing funds during this time. (Gov't Ex. 1).

at 16-17, 43). The agents were dressed in business casual clothes, and their firearms were concealed. (Tr. at 16-17, 43). Davis was not home but as the agents were about to leave, Davis arrived at his apartment. (Tr. at 17, 43). Agent Henriques asked Davis if he remembered him. Davis indicated he did not. The agent asked to speak with Davis inside his apartment, and Davis agreed. (Tr. at 17, 43). Agent Henriques sat on the couch, Agent McAlister stood near the door, and Davis stood between them. (Tr. at 17-18, 43). The agents identified themselves and told Davis that his girlfriend had advised them that Davis had taken the money. Davis responded, "[N]ow I know why you're here." (Tr. at 17).

Agent Henriques advised Davis of his Miranda rights. (Tr. at 18, Gov't Ex. 2).[3] Agent Henriques asked Davis to read the form aloud to him and initial each sentence he read. Davis then signed the form, and the agents signed the form. The form indicates it was signed at 10:05 a.m. (Tr. at 19-20, Gov't Ex. 2).[4]

---

[3] Davis testified he spoke to the agents in the apartment but that he was not advised of his rights until just before they entered a car to go to the location where some of the money was located. (Tr. at 53-54). He stated he did not "believe" that he signed the rights form in the apartment. (Tr. at 54). Davis did not provide specifics about any conversation in the apartment before he was advised of his rights. (Tr. at 52-54). Davis seeks only to suppress statements that he made before he waived his Miranda rights. ([22] at 12-13).

[4] The form states:
Before we ask you any questions, you must understand your rights.
You have the right to remain silent.
Anything you say can be used against you in court.

Agent Henriques testified that Davis was not interviewed in the apartment. After the form was signed, they immediately left to allow Davis to show the agents where he claimed he discarded some of the RFCU funds. (Tr. at 21, 43-44).

Davis entered the car unrestrained and no one physically touched him. He sat in the front passenger seat and gave directions. While driving, Agent McAlister told Davis he was not in custody and was not under arrest. (Tr. at 26). When they arrived at the location identified by Davis, all three men exited the car. They reentered the car when no money was found. (Tr. at 23-24). Agent Henriques told Davis he could leave at any time. (Tr. at 23-25).

Once back in the vehicle, Agent Henriques began recording the conversation. He advised Davis that he was not under arrest and that nothing was going to happen now because the agents still needed to gather information. (Tr. at 25-26, Gov't Ex. 3). Davis then explained what happened to the funds. They returned to the apartment where Davis signed a consent to search form. The agents

---

> You have the right to talk to a lawyer for advice before we ask you any questions.
> You have the right to have a lawyer with you during questioning.
> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
> If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

The form then provides, "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." (Tr. at 20, Gov't Ex. 2).

Case 1:16-cr-00074-WSD-JFK   Document 27   Filed 09/28/16   Page 7 of 18

ultimately recovered $3,200 in missing funds. (Tr. at 26-27, 44).[5] The agents left. Davis was not arrested and he was not handcuffed. (Tr. at 27-28).

During the January 21, 2016, interview of Davis, the agents did not make any promises to Davis, did not threaten him and did not touch or restrain him. (Tr. at 28). The tone of the conversation was calm. Davis appeared to understand the questions and did not appear to be under the influence of drugs or alcohol. (Tr. at 28-30). He did not ask to stop the interview and he did not ask for an attorney. (Tr. at 30). The agents spent approximately one hour and thirty minutes with Davis. The last twenty-four minutes were recorded. (Tr. at 30, Gov't Ex. 3).

On February 16, 2016, Davis was indicted by a federal grand jury on a charge of taking and carrying away with the intent to steal and purloin approximately $170,160.00 of money belonging to Robins Federal Credit Union, in violation of 18 U.S.C. § 2113(b). (Indictment [1]).[6]

## II. STANDARD OF REVIEW

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59;

---

[5] Davis is not challenging the consent to search. (Tr. at 46-47).
[6] Additional facts will be set forth as necessary during discussion of Davis's motion to suppress statements.

Williams v. Wainwright, 681 F.2d 732, 732 (11th Cir. 1982) (per curiam). A district judge "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). With respect to those findings and recommendations to which a party has not asserted objections, the Court must conduct a plain error review of the record. United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983). Here, neither the Government nor Davis filed objections to the R&R and the Court reviews the findings and recommendations in the R&R for plain error.

**III.   DISCUSSION**

"[A] person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966)). "An officer's obligation to administer Miranda warnings attaches . . . only where there has been such a restriction on a person's freedom as to render him in custody." Id. (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam)) (internal

quotation marks omitted); accord United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006).

Whether a person is in custody "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury, 511 U.S. at 323; see also United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006) (same). While "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned[,]" Stansbury, 511 U.S. at 325, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was in custody at a particular time . . . ," United States v. Lall, 607 F.3d 1277, 1284 (11th Cir. 2010) (citation and internal quotation marks omitted). "[U]nder the objective standard, the reasonable person from whose perspective custody is defined is a reasonable innocent person." Street, 472 F.3d at 1309 (citation omitted); see also Brown, 441 F.3d at 1347 (same); United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996) ("Whether a defendant knows he is guilty and believes incriminating evidence will soon be discovered is irrelevant."). The objective factors to be considered include "'whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled, as well as the location and length

of the detention.'" United States v. Riquene, 552 F. App'x 940, 942 (11th Cir. 2014) (quoting United States v. Luna-Encinas, 603 F.3d 876, 881 & n.1 (11th Cir. 2010)).  Whether a person is in custody depends on the "totality of the circumstances."  See, e.g., Lall, 607 F.3d at 1284; United States v. McDowell, 250 F.3d 1354, 1362 (11th Cir. 2001).

    A.    December 9, 2015, Interview

Davis contends that Miranda warnings were required to be given to him before he was interrogated on December 9, 2015, because he was, at the time, in custody.  In support of his argument, Davis identifies three factors supporting that the investigation was custodial: that he did not go to the FBI offices voluntarily, that Special Agent Henriques advised Davis that he would be free to go "at the end of the day," and that the interview was conducted at the secured FBI offices.  ([22] at 5-12).  The totality of the circumstances, considered objectively, do not support that an innocent person would have reasonably believed that he was in custody on December 9, 2015.

Davis's reliance on the location of the interview is not dispositive.  In California v. Beheler, 463 U.S. 1121 (1983), the Supreme Court considered the interview of a defendant at a police station.  The Supreme Court stated: "[W]e have explicitly recognized that Miranda warnings are not required 'simply because the

10

questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" Id. at 1126 (quoting Mathiason, 429 U.S. at 495 ("a noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment'" such as a police station or because the person is one suspected of committing a crime)).[7]

That the FBI offices where the interview was conducted was a "secure" space is not sufficient to support that the questioning was custodial.  When Davis arrived, along with Anfeldt and Carrington, he was greeted by Agents Henriques and Fitzgibbons outside the lobby, and the three visitors entered through security and Davis was then escorted to the law library for the interview.  (Tr. at 5). Consistent with FBI building protocol, Davis was escorted to the place of the interview.  (Tr. at 5-6, 38-39).  Once in the FBI space on each floor, any secured

---

[7]  Although not raised by Davis as a factor supporting a finding of custody, that the agents suspected Davis of stealing the funds from the ATMs does not render the questioning custodial.  See Stansbury, 511 U.S. at 325 ("Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest."); United States v. Manor, 936 F.2d 1238, 1241 (11th Cir. 1991) ("The Supreme Court has clearly stated that Miranda is not implicated simply because an individual is the subject or target of an investigation.") (citing Minnesota v. Murphy, 465 U.S. 420, 431 (1984)).

doors may be opened to depart because they are not locked from the inside. The space may be freely existed. (Tr. at 39-40, 46). A person exiting the space is not required to leave through security, but may simply leave the building. (Tr. at 46). The space and its configuration does not support that Davis was in custody. See United States v. Muegge, 225 F.3d 1267 (11th Cir. 2000) (that interview was conducted in a secure facility did "not necessarily make the interrogation custodial" where visitors to facility were escorted while in the building and, although facility was locked, no key was needed to leave the building); see also United States v. Ambrose, 668 F.3d 943, 956-57 (7th Cir. 2012) (that defendant was interviewed at FBI offices, appearing "essentially" on orders to do so, was required to relinquish weapons, cell phones and keys at security entrance and was escorted while in the building, was "not indicative of custody to a reasonable person because the security restrictions were uniformly applied"); United States v. Paige, 241 F. App'x 620, 622 n.1, 623 (11th Cir. 2007) (defendant, who traveled to police department with police detective, was advised he was not under arrest and was free to leave, was not in custody during interview that took place in unlocked room at department with three law enforcement officers present, after which detective drove defendant to his girlfriend's home); United States v. Bazile, 2013 WL 3776271, at *11 (S.D. Fla. July 17, 2013) (defendant, who was

interviewed on two occasions at FBI offices and was driven to interviews by law enforcement officers, was not in custody, noting that defendant was escorted while in the building but was not otherwise restrained or handcuffed, was advised that his statement was voluntary and went home after interview).  Here, Davis did not suffer "such a restriction on [his] freedom as to render him in custody."  See Stansbury, 511 U.S. at 322 (citation and internal quotation marks omitted).

     Davis next argues that he was told by his supervisor to go with Anfeldt and that he was fearful of reprimand or termination if he did not comply with the instructions.  (Tr. at 34-35, 51-52).  Davis concedes he was not told by anyone that he would suffer adverse consequences for not accompanying Anfeldt.  (Tr. at 12, 34, 45, 54).  The agents, in fact, told Davis the interview was voluntary.  (Tr. at 10-11, Gov't Ex. 1).  In Muegge, the court found that, although the defendant's supervisor instructed him to report for the interview with investigators, "such an order, absent other coercive elements, did not constitute the type of restraint on [the defendant's] freedom associated with a formal arrest."  Id. at 1270.  Like in Muegge, the instruction by Davis's supervisor in this case for Davis to attend the interview "was [not] accompanied by any explicit or implicit threat to [the defendant's] employment status."  See id. at 1271; see also United States v. Dudley, 2011 WL 1100607, at *5 (N.D. Ga. Feb. 3, 2011) (noting that defendant

cited "nothing coercive about the circumstances" of interview "except for the fact that he feared he would lose his job if he did not cooperate with the . . . investigators" because his supervisors ordered him to speak with them, the court found that this was "insufficient to create a custodial interrogation requiring that Miranda warnings be given"). While Davis may have felt compelled to go to the FBI offices, once he arrived, the agents advised him that the interview was voluntary and that he was not under arrest and was free to leave. (Tr. at 10-12, 14, 36-37, Gov't Ex. 1).

Finally, Davis argues that Agent Henriques's statement that "at the end of the day" Davis would be leaving shows his questioning was custodial. The Court disagrees. It is objectively evident to anyone listening to the interview that the agent uses the phrase in a number of different contexts (Gov't Ex. 1), and was not saying that Davis was restrained for questing throughout the day, including because Davis was told plainly that the interview was voluntary, that he was not under arrest and that he was going home and was not going to be arrested that day. (Tr. at 10-11, 14-15, Gov't Ex. 1). Davis was not handcuffed nor otherwise physically restrained. (Tr. at 12). He was not threatened. (Tr. at 12-13). That Davis was repeatedly, and unambiguously, told that he was not under arrest and that cooperation is voluntary "is a powerful factor in the mix [for determining the

14

issue of custody], and generally will lead to the conclusion that the defendant is not in custody absent a finding of restraints that are 'so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.'" Brown, 441 F.3d at 1347 (citation omitted; emphasis in original).

There simply is no evidence to support that the December 9, 2015, interview was conducted while Davis was in custody. The Court thus finds that Davis was not in custody on December 9, 2015, and that the agents were not required to advise Davis of Miranda warnings before the interview was conducted.

B.   January 21, 2016, Interview

Davis next seeks to suppress the statements that he made to FBI agents on January 21, 2016, while in his apartment and before he was advised of his Miranda rights. He claims these statements also were made while he was in custody.[8] ([22] at 12-13). Davis does not present any facts to support that he was in custody at any

---

[8] Davis does not seek to suppress statements that he made to law enforcement, which were recorded (Gov't Ex. 3), after he concedes being advised of Miranda rights. Davis also does not challenge that he knowingly, intelligently, and voluntarily waived his Miranda rights. ([23] at 13 & n.2). The Court will not address events occurring after Davis testified that he received Miranda warnings and waived those warnings. Indeed, Agent Henriques credibly testified that Davis was advised of and waived his Miranda rights immediately after the agents entered him apartment and identified themselves, and the subject matter of their visit, and before any conversation with Davis occurred. (Tr. at 17-20, Gov't Ex. 2).

15

time on January 21, 2016, much less while speaking with the two FBI agents in his apartment. (Id.).

On January 21, 2016, at approximately 9:55 a.m., Agents Henriques and McAlister arrived at Davis's apartment. (Tr. at 16-17, 43). The agents were dressed in business casual clothes, and their firearms were concealed. (Tr. at 16-17, 43). The agents knocked on the door but no one responded. As they turned to leave, Davis arrived at the apartment. (Tr. at 17, 43). Agent Henriques asked if they could speak with Davis inside his apartment. Davis agreed and invited the agents in. (Tr. at 17, 43). Once in the apartment, the agents again identified themselves and explained that they had conducted additional investigation and that Davis's girlfriend had advised that Davis had taken the money. Davis responded, "[N]ow I know why you're here." (Tr. at 17).[9]

---

[9] At this point, Agent Henriques testified, Davis was advised of his Miranda rights and waived those rights. (Tr. at 17-20, 43, Gov't Ex. 2). Davis testified that the rights were not given until he and the agents exited the apartment to try to find the missing funds. (Tr. at 52-54). However, only a few minutes could have elapsed between the time when the agent and Davis each state that Miranda rights were given and waived. It is undisputed that the agents arrived at Davis's apartment at approximately 9:55 a.m. (Tr. at 43). The Miranda rights form indicates that the form was prepared at 10:03 a.m. and signed at 10:05 a.m. (Tr. at 18-20, Gov't Ex. 2). As Agent Henriques testified, no lengthy questioning or interview took place before Davis was advised of and waived his rights. (Tr. at 21-22, 43-44).

During the January 21, 2016, conversation, the agents did not make Davis any promises, did not threaten him and did not touch or physically restrain Davis. (Tr. at 28). The tone of the conversation was calm. Davis understood what was said to him and did not appear to be under the influence of drugs or alcohol. (Tr. at 28-30). Davis was with the agents for less than ten (10) minutes when he was given, and he acknowledged, his Miranda rights. (Tr. at 30, Gov't Ex. 3). Davis was not arrested and he was not handcuffed at any time during the questioning. (Tr. at 27-28).

That the agents asked for and received permission to enter Davis's apartment and to speak with him supports their questioning of Davis was not custodial. "Although the location of the interview is surely not dispositive in determining whether the interviewee was in custody, [c]ourts are much less likely to find the circumstances custodial when the interrogation occurs in the suspect's home." Brown, 441 F.3d at 1348 (citations and internal quotation marks omitted); see also United States v. Matcovich, 522 F. App'x 850, 851 (11th Cir. 2013) (same).[10]

---

[10] Davis was advised while traveling with the agents to look for the missing funds that "he wasn't in custody, he wasn't under arrest." (Tr. at 26). This is an important factor in finding that Davis was not in custody. See Matcovich, 522 F. App'x at 851; Brown, 441 F.3d at 1347-48. Finally, that Davis was the focus of the agents' investigation into the missing RFCU funds and that they advised him of the information obtained during their investigation implicating him in the crime

Davis simply was not in custody for the few minutes on January 21, 2016, when he was in his apartment speaking to the agents.

## IV.  CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that Magistrate Judge Janet F. King's Report and Recommendation [24] is **ADOPTED**.

**IT IS FURTHER ORDERED** that Defendant Joshua Davis's Motion to Suppress Statements [16] is **DENIED**.

**SO ORDERED** this 28th day of September, 2016.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE

---

does not result in a finding that he was in custody.  See Stansbury, 511 U.S. at 324-325; Manor, 936 F.2d at 1241.