IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.                                                          1:16-cr-00074-WSD

JOSHUA DAVIS,

                         Defendant.

## OPINION AND ORDER

This matter is before the Court on the Government's Motion to Admit

Testimony of Philicia Morris [43] ("Motion to Admit").

## I.    BACKGROUND

### A.    Facts

#### 1.    Incident and Ms. Morris's FBI Interview

On October 15, 2015, Defendant Joshua Davis ("Defendant"), who then

worked as a Brink's driver, allegedly stole $170,160.00 in Robins Federal Credit

Union ("RFCU") funds.  That day, the Defendant drove a Brink's truck route with

his co-worker, Naheem Carrington.  The Defendant serviced the RFCU ATMs and,

in the process, allegedly took approximately $20,000 to $30,000 from each of eight

separate RFCU ATMs he serviced.  After servicing the RFCU ATMs, the

Defendant drove the Brink's truck to Atlanta, where it ran out of gas.  A tow truck

was called.  The Defendant called his then-girlfriend, Philicia Morris, to pick him

up while Mr. Carrington waited in the back of the truck for the two truck to arrive.

A month later, on November 15, 2015, the Defendant was indicted.

On January 7, 2016, Ms. Morris voluntarily submitted to an interview by

Federal Bureau of Investigation ("FBI") Special Agent Samone Brown and Task

Force Officer Darline Scott.  The interview was audio recorded.  (Philicia Morris

Interview[1]).  Ms. Morris stated to the agents that, after the Brink's truck broke

down, the Defendant called to ask Ms. Morris to pick up Defendant so they could

purchase food.  (Id.).  Ms. Morris drove to the Brinks truck location in her car, and

she and the Defendant drove to a nearby Wendy's.  (Id.).  When the Defendant and

Ms. Morris were at Wendy's, Mr. Carrington called the Defendant from the

Brink's truck.  (Id.).  He asked the Defendant to return because the police were at

their Brink's vehicle.  (Id.).  Ms. Morris heard Mr. Carrington say to the

Defendant:  "somebody got out with a black bag and it had money in it."  (Id.).

Ms. Morris asked the Defendant, "what money, what are you talking about . . . you

got money on you or something?"  (Id.).  Ms. Morris stated that the Defendant

---

[1]     The Government provided the Court with a CD containing the
audio-recorded interview of Ms. Morris.

responded "yes."  Ms. Morris told investigators that she "freaked out" and "told

him to . . . just get it out of [her] car."  (Id.).

Ms. Morris told the agents that the Defendant stuffed the stolen money into a

pink bag that was in Ms. Morris's car.  (Id.).  The Defendant then "threw [the pink

bag filled with money] out" of the car window "on the side of the road

somewhere."  (Id.).  Ms. Morris told agents that she did not know what happened

to the money after it was thrown out of her car.  (Id.).  She drove the Defendant

back to the Brink's truck where the police were waiting.  (Id.).  The police

searched the Defendant's black bag, which was in Ms. Morris's car.  Officers

located Defendant's firearm and ammunition, but did not locate any money.  (Id.).

After the tow truck arrived, Ms. Morris was allowed to leave.  (Id.).  Ms. Morris

stated:  "after that, [she and the Defendant] stopped talking for one or two

months." (Id.).

### 2.     The Defendant and Ms. Morris's Relationship

The Defendant contends that, at the time of the alleged theft on

October 15, 2015, he and Ms. Morris "were in a long term relationship and already

had plans to get married even though they were not married on that date."  ([45] at

2).[2]  Ms. Morris states that she met the Defendant in 2008, and that the two began an intimate relationship.  ([54.1] at 1).  She states that she and the Defendant lived together for three months beginning in June 2013, until she moved to South Carolina to finish school.  (Id. at 2).  When she finished school in December 2013, she returned to Atlanta and lived with the Defendant and his family until March 2014, when Defendant moved to Indiana to attend truck driving school. (Id.).

Ms. Morris states that, in September 2014, the Defendant asked her to marry him, and she "told him that she would."  (Id. at 2).  In October 2014, the two again lived together at the Defendant's mother's home.  Ms. Morris states she did not sleep in the same room with Defendant during this time because the Defendant's mother did not think it was proper.  (Id.).  In December 2014, the Defendant and Ms. Morris moved to Forest Park, Georgia.  In May 2015, Ms. Morris states they moved to a rental home.  On November 20, 2015, Ms. Morris claims she and Defendant "decided that they love[d] each other and it was time to make a permanent commitment.  On April 5, 2016, they went down to city hall and got

---

[2]     After she married, Ms. Morris apparently changed her name, and Defendant refers to her as "Mrs. Davis."  (See [54] at 9).  For the sake of consistency and clarity, the Court continues to refer to her in this Order as Ms. Morris.

married."  (Id. at 3).  These statements are generally corroborated by the interviews

of Ms. Morris's cousin and friend.  ([54.2], [54.3]).

The Government notes that the Defendant and Ms. Morris married shortly

after Mr. Morris gave her statement to the FBI, and after the Defendant was

indicted.  It notes also that the Defendant described Ms. Morris as a "female

associate" during a recorded interview with FBI agents on December 9, 2015.

([55] at 13).  The Government also points out that, after the events of

October 15, 2015, Ms. Morris stated that she and Defendant "stopped talking for

one or two months."  (Philicia Morris Interview).

B.    Procedural History

On November 15, 2016, a First Superseding Indictment [31] charged

Defendant with (1) theft of credit union funds, in violation of 18 U.S.C. § 2113(b),

and (2) possession of stolen credit union funds, in violation of 18 U.S.C. § 2113(c).

On December 1, 2016, the parties filed their respective motions *in limine* [36],

[37].

On December 13, 2016, the Court held a teleconference with the parties.

During the teleconference, the Court denied, as moot, the Government's Motions

*in Limine* after defense counsel represented that he currently does not intend to

introduce (1) evidence of general good character and of specific instances of good

conduct, (2) evidence that could promote jury nullification, and (3) evidence of the penalties associated with the charged offenses.  ([39]).  The Court also denied, as moot, Defendant's motion to exclude "Mr. Carrington's [telephone] statement that somebody told Mr. Carrington that they saw Mr. Davis get out with a bag or a bag with money in it," after the Government represented that it does not intend to use that testimony by Mr. Carrington.  (Id.).

During the teleconference, defense counsel stated that he also seeks to exclude, on the basis of hearsay, testimony by Philicia Morris about the comments she overheard during the telephone call between the Defendant and Mr. Carrington.  The Court, considering the hearsay argument and that Ms. Morris is married to the Defendant, required the parties to brief the following issues: (1) whether Ms. Morris's testimony regarding the telephone call is hearsay, and (2) whether any marital privileges apply to her testimony.  ([39]).

On December 20, 2016, the Government filed its Motion to Admit the testimony of Ms. Morris.  The Government argues that, because Ms. Morris overheard the telephone call before she married Defendant, the spousal testimonial privilege does not apply.  It argues that, even if the privilege applied to pre-marital communications, the privilege does not apply because the marriage was collusive. The Government contends further that Ms. Morris's testimony is not hearsay,

because it will be offered to explain the effect it had on Ms. Morris, and is not offered for the truth of the matter asserted.

On January 13, 2017, the Court set a briefing schedule on the specific issue of the adverse spousal testimonial privilege.  ([52]).  Counsel for Ms. Morris has invoked the adverse spousal testimonial privilege on Ms. Morris's behalf.  ([54]).

## II.    DISCUSSION

### A.    Hearsay

The Court first finds Ms. Morris's expected trial testimony is not hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted in the statement.  See Fed. R. Evid. 801(c).  The Government asserts that it does not seek to offer, for the truth of the matter asserted, testimony from Ms. Morris about the telephone conversation.  After hearing Mr. Carrington's statement about a black bag with money, she asked Defendant questions regarding the money, Ms. Morris "freaked out," and she told Defendant to get the money out of her car.  Ms. Morris stated Defendant then stuffed the money into a pink bag and threw it out of the window.  The Government asserts it intends to elicit Ms. Morris's testimony about what she overheard on the phone call only to explain why she asked the Defendant about money and to further explain why she made the statements and asked the questions she did and what Defendant then did with

the money and the pink bag.   The testimony also explains the reasons why, and

Defendant's state of mind when, he disposed of the money.   The Court finds the

statement Ms. Morris heard on the call by the person who called Defendant is not

hearsay, because it explains the subsequent events and Defendants' conduct.   See

Ramos-Barrientos v. Bland, 728 F. Supp. 2d 1360, 1374 (S.D. Ga. 2010)

(statements offered to explain a course of conduct do not constitute hearsay (citing

United States v. Tokars, 95 F.3d 1520, 1535 (11th Cir. 1996))).   The largest part

of Ms. Morris's testimony does not consist of what she heard, but what she said

and saw, which is not hearsay.   What the Defendant said is not hearsay because it

is admissible as the statement of a party opponent.   Fed. R. Evid. 801(d)(2).

   B.   Spousal Privilege

   Federal Rule of Evidence 501 provides that "[t]he common law—as

interpreted by United States courts in the light of reason and experience—governs

a claim of privilege . . . ."   Fed. R. Evid. 501.   Federal law recognizes two marital

privileges:   (1) the marital confidential communications privilege

("Communications Privilege"), and (2) the spousal testimonial privilege

("Testimonial Privilege").   United States v. Singleton, 260 F.3d 1295, 1297 (11th

Cir. 2001) (citing Trammel v. United States, 445 U.S. 40, 50-51 (1980)).   Marital

privileges "must be narrowly construed because they impede the search for truth."

Id. at 1300.  "Federal courts have consistently recognized the 'well settled proposition that the party seeking the privilege has the burden of establishing all of its essential elements.'"  Bridgewater v. Carnival Corp., 286 F.R.D. 636, 638 -39 (S.D. Fla. 2011) (internal quotation marks omitted) (quoting In re Air Crash Near Cali, Colombia, 959 F. Supp. 1529, 1532 (S.D. Fla. 1997)); see also In re Grand Jury Subpoenas, 318 F.3d 379, 384 (2d Cir. 2003) (collecting cases).  Ms. Morris asserts the Testimonial Privilege in this case.

The Testimonial Privilege applies in a criminal case to any adverse testimony one spouse might provide as a witness against the other spouse. United States v. Brock, 724 F.3d 817, 822 (7th Cir. 2013).  The privilege applies to testimony "on any adverse facts, no matter how they might have become known to the witness-spouse."  Id.  Unlike the Communications Privilege, the Testimonial Privilege does not survive the dissolution of the marriage.  See id.  Historically, the Testimonial Privilege could be invoked by either spouse to prevent the other from testifying.  In 1980, the United States Supreme Court in Trammel narrowed the scope of the Testimonial Privilege, holding that it "can be asserted only by the witness-spouse."  Singleton, 260 F.3d at 1298 n.2.

The purpose of the Testimonial Privilege is to protect the harmony and sanctity of marriage.  2 Federal Evidence § 5:39 (4th ed.).  Courts have reasoned

that testifying against one's spouse is likely to cause serious damage to a marriage, including by causing it to end.  Id. (citing Hawkins v. United States, 358 U.S. 74, 77 (1958) (testimony by one spouse against the other in a criminal trial would be an "unforgivable act" sealing the fate of a marriage)).  The Testimonial Privilege rests upon "its perceived role in fostering the harmony and sanctity of the marriage relationship," Trammel, 445 U.S. at 44, and the "*natural repugnance* in every fair-minded person to compelling a wife or husband to be the means of the other's condemnation, and to compelling the culprit to the humiliation of being condemned by the words of his intimate life partner," 8 Wigmore, Evidence § 2228 at 217 (emphasis in original), forced from her by governmental compulsion.  In re Grand Jury Subpoena U.S., 755 F.2d 1022, 1028 (2d Cir. 1985), vacated sub nom. United States v. Koecher, 475 U.S. 133, 106 S. Ct. 1253, 89 L. Ed. 2d 103 (1986).[3]

The Government contends that the Testimonial Privilege does not apply to Ms. Morris's testimony because:  (1) the matters about which she would be called to testify occurred prior to the marriage; (2) Ms. Morris participated in the Defendant's crime and the conduct about which she would be called to testify; and

---

[3]      These purposes have been subject to some criticism.  See, e.g., David Medine, The Adverse Testimony Privilege: Time to Dispose of a "Sentimental Relic", 67 Or. L. Rev. 519 (1988).  The Testimonial Privilege was not included in the Model Code of Evidence (1942) and the Uniform Rules of Evidence (1953).

(3) her marriage to the Defendant was collusive and was entered into solely to avoid Ms. Morris testifying.  The Court considers each of these arguments below, noting at the outset that the questions presented are of first impression in our Circuit and elsewhere.

       1.    <u>Pre-Marital Communications</u>

The Government contends that the adverse testimonial privilege does not apply to a spouse's testimony about facts that occurred before a marriage.  This question is a matter of first impression in our Circuit.  The Government relies on two Seventh Circuit opinions:  <u>United States v. Van Drunen</u>, 501 F.2d 1393 (7th Cir. 1974) and <u>United States v. Clark</u>, 712 F.2d 299 (7th Cir. 1983).  In <u>Van Drunen</u>, the Seventh Circuit found that the Testimonial Privilege did not apply, because the evidence suggested the couple married to permit spousal testimony to be suppressed, and the "defendant's wife's testimony concerned matters prior to the marriage[.]"  502 F.2d at 1397.[4]  In <u>Clark</u>, the Seventh Circuit extended the holding in <u>Van Drunen</u>, finding that the Testimonial Privilege does not apply to events prior to a marriage even if there is no evidence that the

---

[4]    Other courts similarly have held that a "collusive" marriage cannot be used to invoke the adverse testimonial privilege.  <u>See, e.g.</u>, <u>United States v. Saniti</u>, 604 F.2d 603, 604 (9th Cir. 1979); <u>United States v. Apodaca</u>, 522 F.2d 568, 571 (10th Cir. 1975).  The Court discusses this exception below.

marriage was entered into collusively.  712 F.2d at 302.  The Court reasoned that,

"[b]y imposing a general rule that the privilege does not cover premarriage acts,

courts can avoid mini-trials on the issue of the sincerity of the parties in getting

married."  Id.

Later Seventh Circuit cases appear to implicitly overrule Clark.  See

A.B. v. United States, 24 F. Supp. 2d 488 (D. Md. 1998) (recognizing Clark

overruled by later Seventh Circuit cases).  In United States v. Byrd, 750 F.2d 585,

590 (7th Cir. 1984), the Seventh Circuit found that the "testimonial

privilege . . . applies to all testimony against a defendant-spouse, including

testimony on nonconfidential matters and matters which occurred prior to

marriage."  In United States v. Lofton, 957 F.2d 476, 477 (7th Cir. 1992), the

Seventh Circuit plainly stated that the Testimonial Privilege includes "matters

which occurred prior to the marriage."  More recently, in United States v. Brock,

724 F.3d 817, 822 (7th Cir. 2013), the Seventh Circuit broadly defined the

Testimonial Privilege to encompass "testimony on any adverse facts, no matter

how they might have become known to the witness-spouse."   Even though the

court did not expressly address pre-marriage conduct, the Seventh Circuit's broad

definition seemingly encompasses facts learned prior to the marriage, and with this

interpretation is consistent with the decisions in Byrd and Lofton.  None of the

Seventh Circuit's post-Clark decisions address the apparent contradictions between these interpretations of the Testimonial Privilege and the holding in Clark.

The Court finds the Testimonial Privilege applies to pre-marital events. The bright-line rule in Clark helps courts avoid mini-trials regarding the sincerity of the parties in getting married.[5] But Clark's pre-marriage exclusion rule eviscerates the purpose upon which the Testimonial Privilege is based—to protect the harmony and sanctity of an intact marriage. See A.B., 24 F. Supp. 2d at 492 (noting that the discord that occurs when one spouse testifies against the other occurs regardless of when the events underlying the testimony took place); David Medine, The Adverse Testimony Privilege:  Time to Dispose of a "Sentimental Relic", 67 Or. L. Rev. 519, 530 (1988) (noting the Clark rule is inconsistent with protecting the ongoing marital relationship). The purpose of the privilege is to protect the solemnity of marriage by avoiding the disruption that occurs where one spouse is forced to testify against the other. When a spouse is forced to testify against his or her spouse, damage is inflicted whether the subject of the testimony concerns events learned prior to the marriage or during it. The presumed adverse effect on the

---

[5]     It is also likely that application of the Clark rule would prevent collusive or "sham" marriages, that is, marriages entered into to avoid testifying. Concerns regarding collusive marriages, however, can be adequately addressed by applying the collusive marriage exception to the Testimonial Privilege, as discussed below.

marriage is the same in both cases. The Seventh Circuit's most recent statements refusing to distinguish between pre- and post-marriage events recognizes that the reasoning in Clark is not persuasive here or in the Seventh Circuit.

The Court's conclusion is also supported by the reasoning in cases holding that the Testimonial Privilege does not apply if a marriage is in permanent disrepair. See, e.g., United States v. Porter, 986 F.2d 1014 (6th Cir. 1993) (Testimonial Privilege did not apply where spouses were permanently separated); In re Witness Before Grand Jury, 791 F.2d 234 (2d Cir. 1986) (where couple had lived apart for the last 11 years, Testimonial Privilege did not apply because the couple "did not have the kind of vital marriage for which the privilege was created"). Where, as in these cases, the marriage is nothing but a legal formality, there is no marital relationship to protect. Where, however, a marriage is intact, courts seek to protect it from the adverse consequences of forcing one spouse to testify against the other regardless of whether the subject matter of the testimony concerns pre- or post-marriage events. See A.B., 24 F. Supp. 2d at 492 ("[O]nce a court determines that a valid marriage exists, the privilege . . . should apply to all matters, whether they occurred before or after the marriage."). The Court respectfully declines to follow the rule in Clark.

14

2.     Joint Participant Exception

The Government next argues that Ms. Morris cannot assert the Testimonial Privilege because she participated in Defendant's crime.  Whether there is a joint participant exception to the Testimonial Privilege is also a matter of first impression our Circuit.  The Government again relies on Clark and Van Drunen to support its argument.  Van Drunen appears to be the seminal case establishing the joint participant exception.  In Van Drunen, the defendant was charged with transporting undocumented immigrants.  About a month after he was indicted, the defendant married one of the immigrants he illegally transported.  The Seventh Circuit held that the Testimonial Privilege does not apply where the witness-spouse was a joint participant in the crime in question.  The court based its holding on two grounds.  First, the court found that the goal of preserving the family "does not justify assuring a criminal that he can enlist the aid of his spouse in a criminal enterprise without fear that by recruiting an accomplice or coconspirator he is creating another potential witness."  501 F.2d at 1396.  Second, the Van Drunen court noted that the rehabilitative effect of a marriage on one who has committed a crime, which in part justifies the privilege, is diminished when both spouses are participants in the crime.  The court held that the Testimonial Privilege was limited "to those cases where it makes most sense, namely, where a spouse who is neither

15

a victim nor a participant observes evidence of the other spouses's [sic] crime." Id. at 1397.

In Clark, the Seventh Circuit refined the holding in Van Drunen, finding that the joint participant exception applies even where there is no concern about whether the marriage is a sham. The court noted that the exception is consistent with the general policy of narrowly construing the privilege, and it noted that other Circuits have recognized a joint participant exception to the Communications Privilege.

Other Circuit Courts have found that the joint participant exception does not apply to the Testimonial Privilege. These cases have relied in large part on the Supreme Court's decision in Trammel, which narrowed the Testimonial Privilege by holding that the privilege may be asserted only by the witness-spouse. In Appeal of Malfitano, 633 F.2d 276 (3d Cir. 1980), the Third Circuit rejected the joint participant exception to the Testimonial Privilege. The court observed that the following rationales have been presented to justify the exception: (1) where marriage partners are involved in crime, it is more likely that the marriage is unstable and there is no need to protect the marriage; and (2) marriages with partners that engage in crime should not be protected. Regarding the first rationale, the court noted that Trammel relied on the fact that if the witness-spouse

is willing to testify, then the marriage probably is beyond salvage, thus satisfying any concern that the privilege not be extended to marriages that in fact need no protection.  With respect to the second rationale, the court noted that the traditional rule holds that the Testimonial Privilege should be extended to all valid marriages, even those with domestic difficulties.  The court found that an isolated criminal act does not strip a marriage of all social value.

In In re Grand Jury, the Second Circuit, in rejecting the joint participant exception, noted that the rationale used by the Seventh Circuit in Van Drunen "has been largely undermined by the Supreme Court's decision in Trammel."  755 F.2d at 1026.  Because Trammel allowed only a witness-spouse to assert the Testimonial Privilege, the Second Circuit reasoned that "[a] person desiring to enlist the aid of his spouse as an accomplice cannot now be sure that he is not creating another potential witness; he takes the risk that the spouse may choose to testify."  Id.  Regarding the second rationale offered by Van Drunen, that in circumstances of joint participation in crime the marriage is unlikely to be an important institution contributing to the rehabilitation of the defendant spouse, the Second Circuit found the rationale was not "especially forceful[,]" including because it "had never been regarded as one of the interests served by the spousal privilege" and because the Second Circuit doubted that "a marriage cannot be a

17

devoted one simply because at some time the partners have decided to engage in a criminal activity." Id.  The court concluded that "we do not see sufficient reason for creating a joint participation exception, particularly in the light of Trammel." Id. at 1026-27.

In United States v. Ramos-Oseguera, 120 F.3d 1028 (9th Cir. 1997), overruled on other grounds by United States v. Nordby, 225 F.3d 1053 (9th Cir. 2000), the Ninth Circuit also relied on Trammel in holding there is no joint participant exception to the Testimonial Privilege.  In reaching its conclusion, the court noted that the Supreme Court in Trammel, in which the witness-spouse was an unindicted co-conspirator, held that that Testimonial Privilege requires that "the witness may be neither compelled to testify nor foreclosed from testifying." Id. at 1042 (quoting Trammel, 445 U.S. at 53).

In the absence of binding precedent, the Court finds the approach taken by the Second, Third, and Ninth Circuits convincing.  The Court finds particularly persuasive the Second Circuit's finding that the Trammel decision undermines the reasoning in Van Drunen, the leading decision carving out a joint participant exception to the Testimonial Privilege.  As the Second Circuit noted, "[i]n light of its existence since the early days of the common law and of the importance of the interests which the [Testimonial P]rivilege serves, we would leave the creation of

exceptions to the Supreme Court or to Congress." In re Grand Jury, 755 F.2d at 1029; see also A.B., 24 F. Supp. 2d at 494 ("The privilege, sanctioned by the Supreme Court and hundreds of years of common law, is 'designed to protect the marriage relationship as it exists at the time of trial, [and] applies to all testimony of any kind.'"  (quoting United States v. Ammar, 714 F.2d 238, 258 (3d Cir. 1983))).

Even if there was a joint participant exception to the Testimonial Privilege, it would not apply here.  The crime in this case was committed by the Defendant when he allegedly took possession of credit union funds, placed them in a black bag and took the bag from the Brink's vehicle.  There is no evidence Ms. Morris was told that the Defendant wanted her to pick him up so that he could abscond with the money, and the facts as presented suggest Ms. Morris was unaware of the theft until she overheard the comments made by Mr. Carrington that someone had taken money and the police were investigating.  Her remarks to get the money out of the car are most reasonably interpreted as Ms. Morris not wanting to be part of a crime the Defendant had already committed.  There is insufficient evidence to show Ms. Morris was a joint participant in the Defendant's crime, even if the joint participant exception applied to the Testimonial Privilege.  The Court thus holds

that the joint participant exception does not apply to the Testimonial Privilege and, even if it did, it would not apply here.

        3.    <u>Collusive Marriage Exception</u>

Finally, the Government contends that the Testimonial Privilege does not apply because Defendant and Ms. Morris married solely to prevent Ms. Morris from testifying against Defendant.  Though the Eleventh Circuit has not addressed the issue, the former Fifth Circuit recognized that "[i]t is well established than an exception to the husband-wife privilege exists if the trial judge determines that the marriage is a fraud."  <u>See</u> <u>United States v. Mathis</u>, 559 F.2d 294, 298 (5th Cir. 1977);[6] <u>accord</u> <u>Lutwak v. United States</u>, 344 U.S. 604, 614-15 (1953) (Testimonial Privilege does not apply where "the relationship was entered into with no intention of the parties to live together as husband and wife but only for the purpose of using the marriage ceremony in a scheme to defraud"); <u>United States v. Saniti</u>, 604 F.2d 603, 604 (9th Cir. 1979) (a "sham" marriage cannot be used to invoke the Testimonial Privilege); <u>United States v. Apodaca</u>, 522 F.2d 568, 571 (10th Cir. 1975) (Testimonial Privilege will not be upheld where "it is based upon a

---

[6]    In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

fraudulent, spurious marriage that was not entered into in good faith"); A.B., 24 F. Supp. At 492 ("Only where there is evidence that a marriage is simply a fraud or a sham . . . should a court forbid the invocation of the marital privilege.").

That a couple married shortly before trial, standing alone, does not render a marriage a sham.  See San Fratello v. United States, 340 F.2d 560, 566 (5th Cir. 1965) (Testimonial Privilege applied where defendant married witness "after the commission of the offense and a short time before trial"); see also In re Grand Jury Proceedings, 777 F.2d 508 (9th Cir. 1985) (Testimonial Privilege applied where spouses lived together for two years and married when one was served with subpoena).  In In re Grand Jury Proceedings, the Ninth Circuit noted that, while "[t]he timing of a marriage will always be a factor[,]" it "is only one of the factors" a court should consider, and, where "[a]ll the other evidence shows that the marriage was entered in good faith, and [the couple] plan to continue their marital relationship[,]" the Testimonial Privilege applies.  777 F.2d at 509; see also In re Grand Jury Subpoena of Witness, 884 F. Supp. 188, 190 (D. Md. 1995) (finding that, while the timing of the marriage indicated the couple may have been motivated, in part, by obtaining the Testimonial Privilege, the marriage was not a sham because the couple had lived together for a sufficient period of time before marriage to show the personal relationship was genuine).

21

The Defendant contends that, at the time of the alleged theft on October 15, 2015, he and Ms. Morris "were in a long term relationship and already had plans to get married even though they were not married on that date." ([45] at 2).[7] Ms. Morris states that she met the Defendant in 2008, and that the two began an intimate relationship. ([54.1] at 1). She states that she and the Defendant lived together for three months beginning in June 2013, until she moved to South Carolina to finish school. (Id. at 2). When she finished school in December 2013, she returned to Atlanta and lived with the Defendant and his family until March 2014, when Defendant moved to Indiana to attend truck driving school. (Id.).

Ms. Morris states that, in September 2014, the Defendant asked her to marry him, and she "told him that she would." (Id. at 2). In October 2014, the two again lived together at the Defendant's mother's home. Ms. Morris states she did not sleep in the same room with Defendant during this time because the Defendant's mother did not think it was proper. (Id.). In December 2014, the Defendant and Ms. Morris moved to Forest Park, Georgia. In May 2015, Ms. Morris states they moved to a rental home. On November 20, 2015, Ms. Morris claims she and

---

[7]     After she married, Ms. Morris apparently changed her name, and Defendant refers to her as "Mrs. Davis." (See [54] at 9). For the sake of consistency and clarity, the Court continues to refer to her in this Order as Ms. Morris.

Defendant "decided that they love[d] each other and it was time to make a permanent commitment.  On April 5, 2016, they went down to city hall and got married."  (Id. at 3).  These statements are generally corroborated by the interviews of Ms. Morris's cousin and friend.  ([54.2], [54.3]).[8]  Ms. Morris took Defendant's last name.

The Government observes that Defendant and Ms. Morris married shortly after Mr. Morris gave her statement to the FBI and after Defendant was indicted, and observes that the Defendant described Ms. Morris as a "female associate" during a recorded interview with FBI agents on December 9, 2015.  ([55] at 13).  The Government notes that, after the events of October 15, 2015, Ms. Morris stated that she and Defendant "stopped talking for one or two months."  (Philicia Morris Interview).  This evidence, the Government argues, shows the marriage was collusive.

---

[8]      Shabria Jackson, Ms. Morris's cousin, stated that Ms. Morris and the Defendant have been consistently in one another's company over the years and have maintained communication by telephone when unable to see one another. Approximately two years ago, Ms. Morris told Ms. Jackson that she wanted to marry the Defendant.  ([54.2] at 1).  Tionne DeGounette, Ms. Davis's friend, stated that she has known the Defendant since 2011.  She stated that, in 2011 or 2012, Ms. Morris introduced the Defendant as her boyfriend.  ([54.3] at 1).  She stated that the couple have been together for quite some time, and, despite moving around quite a lot, "no matter where [Ms. Morris] lived, [she and the Defendant] have always maintained phone contact."  (Id.).

Ms. Morris provides ample evidence of the history of her relationship with Defendant.  This evidence shows the two have had an on-again-off-again relationship for nearly nine years.  They cohabitated for a portion of that time, including for most of the last three years.  That Ms. Morris and Defendant "stopped talking for one or two months" after the alleged robbery does not undermine the sincerity of their relationship, because it is natural that Ms. Morris may have been angry or scared following the alleged robbery.  That Defendant referred to her once as a "female associate" during an interview with the FBI also is not compelling evidence of a sham, because there is no indication he was asked to explain in detail the nature of his relationship with Ms. Morris.  He also may have been trying to protect Ms. Morris.  In any event, the statement was a single reference made under unusual circumstances.  The weight of the evidence shows Ms. Morris and Defendant were in a committed, long-term relationship, and that the two intend to continue their marriage relationship.  The timing of the marriage, while raising some suspicion, does not, with the other weak evidence relied upon by the Government, rise to the level necessary to show that the marriage was a sham.  The Court finds Ms. Morris has met her burden to show that she and Defendant married in good faith, and thus that the Testimonial Privilege applies to the testimony sought by the Government.

C.     Spousal Privilege and Unavailability

The Testimonial Privilege does not apply to prior out-of-court statements.

United States v. Chapman, 866 F.2d 1326, 1332-33 (11th Cir. 1989).  Having

found that Ms. Morris is entitled to assert the Testimonial Privilege, the Court

considers whether her statements to the FBI are admissible.  Defendant concedes

that "if the Government can establish there are circumstantial guarantees of

trustworthiness in the statement [Ms. Morris] provided to the FBI SA[] on

January 7, 2016, and they successfully circumvent the obvious confrontation issue,

they could move to introduce her statement [to the FBI.]"  ([54] at 9).

The Confrontation Clause of the Sixth Amendment provides:  "In all

criminal prosecutions, the accused shall enjoy the right . . . to be confronted with

the witnesses against him."  U.S. Const. Amend. VI.  Essentially, this provision

provides to criminal defendants the constitutional right to cross-examine adverse

witnesses.  Chapman, 866 F.2d at 1329-30 (citing United States v. Owens,

484 U.S. 554 (1988)).

"However, the right to confrontation is not absolute."  Id. at 1330.  "This is

because the question of the admissibility of hearsay evidence against a criminal

defendant who has no opportunity for confrontation involves two very important

but competing interests:  the protection of the defendant's fundamental right to

confront the witnesses against him, and the pursuit of the public's interest in the disclosure of reliable information that can lead to effective law enforcement." Id. (citing Ohio v. Roberts, 448 U.S. 56, 64, (1980); Chambers v. Mississippi, 410 U.S. 284, 295 (1973)). "These competing interests dictate that under certain circumstances the defendant's right to confrontation must give way to allow the admission of incriminating evidence even though such evidence cannot be cross-examined." Id. "Two requirements must be met, however, before confrontation may be dispensed with." Id. "First, the prosecution must show that the out-of-court declarant is unavailable to testify despite its good faith efforts to obtain his presence at trial. Second, the prosecution must show that the out-of-court statements bear sufficient indicia of reliability to provide the jury with an adequate basis for evaluating their truth." Id. (citing Roberts, 448 U.S. at 66, 74; Williams v. Melton, 733 F.2d 1492, 1496 (11th Cir. 1984), cert. denied, 469 U.S. 1073 (1984)).

In Chapman, the police received a call from an anonymous woman indicating that the defendant had committed a bank robbery. The telephone call was taped and transcribed by the police. After the call, the police went to the defendant's home and interviewed his wife. During the interview, the police determined the defendant's wife was the anonymous caller. She restated her belief

26

that her husband committed a robbery, and gave police several statements incriminating her husband.  The district court admitted both the tape and the transcript of the phone conversation at trial, and the statements made by the defendant's wife were introduced through the testimony of the police officer who interviewed her.  The defendant's wife did not testify at trial because she asserted her Testimonial Privilege.  Id. at 1329.

Considering whether the requirement of unavailability was met, the Eleventh Circuit held that, where a witness-spouse refuses, on the basis of her marital privilege, to give any substantive testimony, the requirement of unavailability is met.  Id. at 1330.  The court then turned to the second requirement, that the out-of-court statements bear sufficient indicia of reliability.  The Eleventh Circuit noted that reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.  It also noted that, apart from hearsay exceptions, it is important to consider the following factors:  (1) whether the truth of the out-of-court statements is corroborated by other evidence; (2) the extent of the out-of-court declarant's personal knowledge of the defendant's identity and role in the crime; (3) the possibility that the statements are founded on faulty recollection; and (4) the circumstances under which the statements were made.  Id.

The Eleventh Circuit concluded the defendant's wife's statements were sufficiently reliable that the district court's admission of them did not violate the defendant's right to confrontation.  The court noted that substantial circumstantial evidence presented at trial corroborated the wife's statements, the wife had reason to know of the events which she described in her statements, and there was no apparent reason to suspect that her statements were founded on faulty recollection. Id. at 1330-31.  The court noted that the defendant's wife was aware she was speaking to law enforcement officials who could take action based upon her statements, and considered the fact that she knowingly made these statements lent some reliability to them.

Here, it does not appear that Defendant challenges the reliability of Ms. Morris's FBI testimony, or the substance of the statements she made to the FBI.  Ms. Morris clearly had personal knowledge of Defendant's identity and his role in the crime alleged.  As in Chapman, Ms. Morris voluntarily gave statements to law enforcement officials during questioning that was reasonable, straightforward, and calculated to elicit truthful information.  That she gave the statements to the FBI after Defendant was indicted supports that she was aware the statements could adversely affect Defendant, lending reliability to the statements. See Chapman, 866 F.2d at 1331.  Unlike in Chapman, the FBI statements here

28

were recorded, lending them more credibility than the second-hand account found reliable in <u>Chapman</u>.  Though the statements were made approximately three months after the incident, there is nothing to indicate the statements were founded on a faulty recollection.  The Court finds Ms. Morris's statements to the FBI are sufficiently reliable that their admission at trial would not violate Defendant's right to confrontation.

## III.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the Government's Motion to Admit Testimony of Philicia Morris [43] is **DENIED**.  Ms. Morris may assert her Testimonial Privilege.  Ms. Morris's statements to the FBI are admissible at trial.

**SO ORDERED** this 17th day of February, 2017.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE